**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iON Worldwide Inc., et al., | Case No. 16-[__] |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF CHRIS OATWAY IN SUPPORT OF DEBTORS' CHAPTER 11 PETITION

I, Chris Oatway, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer for both iON Worldwide Inc**.** ("iON Worldwide"), a corporation organized under the laws of Delaware, and for iON America LLC ("iON America") a New Jersey corporation, both being the above-captioned debtors and debtors in possession (cumulatively referred to as the "Debtors").  In these capacities, I am familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      I submit this declaration (this "First Day Declaration") to provide an overview of the Debtors' chapter 11 cases.  Except as otherwise indicated herein, all facts set forth in this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: iON Worldwide Inc. (3211); iON America LLC (2612).

First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

### General Background

4.      iON Worldwide is a Delaware corporation with offices  located at 513 South Lenola Road, Moorestown, New Jersey, 08057.  iON Worldwide was formerly a Delaware limited liability company.  Currently, the Debtors own the trademark "iON" and is a licensee for certain other intellectual property used in its business.

5.      iON America is a New Jersey corporation and performs supply chain management, manages inventory, customer support and marketing in the U.S.

6.      Prior to the filing, the Debtors were actively engaged in the design, development, manufacturing and sale of wearable, point of view (POV) action cameras and related products and accessories, under the brand names of iON and Contour.

7.      The Debtors' brands offered a full range of connected and wearable cameras, including products for the higher end of the camera markets, as well as camera hardware and software solutions to enable consumers to shoot, edit, share, live stream and store their video/photo content in the cloud as simply as possible. The Debtors' product line includes home security solutions; dash cams; tiny, wearable, "lifestyle" cameras; and action/adventure cameras.

8.      The Debtors' current products include iON AIR PRO, iON AIR PRO PLUS, iON AIR PRO WIFI, iON Air Pro 2, iON Air Pro 3, CamoCam, Speed-Pro, iON the Game, iON Adventure, iON the home, and SnapCam.  The Debtors' "Contour" products include but are not limited to the Contour Roam 3 Camera, Contour +2 Camera and a series of Contour-branded accessories

9.      The Debtors are one of the few competitors to the industry leader GoPro.  As explained below, the Debtors (and others) are party to a significant intellectual property lawsuit against Go Pro.

10.     In 2014, the Debtors achieved over $25 million in revenues and became the one of the leaders in the POV camera market.  In 2015, sales declined to under $15 million due to many factors.  First, while the company raised approximately 10 million in equity in 2015, these amounts were not sufficient to continue to support the growth of the business and their capital intensive needs.  The Debtors require liquidity and capital for their business, including in connection with the manufacturing of products, investment in significant "point of sale" expenses required by retailers,  and replenishment inventory needed to sell to their customers.  After the Debtors raised equity capital in 2015, they were unable to timely secure a needed line of credit which was required to grow the business and support these expenses.  In an effort to address their liquidity constraints, the Debtors implemented a number of cost cutting measures, including termination of personnel, salary reductions for certain senior level executives, and other reductions in overhead.  However, due to the continuing deterioration of the current economy, the Debtors' liquidity continued to be negatively impacted.  As a consequence of such

events, amounts payable by the Debtors to their suppliers were not paid in full, even by their extended due dates.

11.    Through the year ending December 2015, the Debtors generated revenues of $12.4 million and an EBITDA loss of $15.5 million.

12.    The Debtors pride themselves on developing state of the art products and are positioned to remain a leader in the industry.

**<u>Non-Debtor Affiliates</u>**

13.    World Wide Licenses Limited ("WWL"), an affiliate of the Debtors, is a Hong Kong registered company that owns the trademarks, IP related to camera designs, and performs research and development for the Debtors' product line. WWL is involved in design and development of products, global supply chain and vendor management. Its offices are located at: 16th Floor, On Hing Building, 1 On Hing Terrance, Central Hong Kong.

14.    iON Cameras Ltd, an affiliate of the Debtors, is a UK registered company with the primary role of global e-commerce, website design and development, and European supply chain for iON. Key assets include URL's (websites) and IP around the websites. Its offices are located at: Innovation Centre, 1 Devon Way, Longbridge Technology Park, Birmingham, B31 2TS.

15.    SG Japan KK, an affiliate of the Debtors, is a company registered in Japan and handles operations, sales and customer relationships in Japan. Its offices are located at: Nishi-Shinbashi TS building 7th Floor, 3-3-1 Nishi-Shinbashi Minato-Ku, Tokyo, Japan.

4

**Intellectual Property Rights**

16.     In or around June 2015, iON Worldwide and Contour, LLC ("Contour") entered into a series of transactions and agreements.  Pursuant to a Contribution Agreement, dated June 5, 2015, Contour agreed to contribute certain of its assets, including all of its intellectual owing 50.1% of the membership interests therein.  Under that same agreement, iON Worldwide agreed to assume certain liabilities relating to the attributed assets and iON Worldwide became a 49.9% member in IP Holding.  As part of this merger transaction, Contour received a 40% equity ownership interest in iON Worldwide.   Contour currently owns 28.34% of iON Worldwide. The combined organization brought together assets of Contour—an innovator in the point-of-view camera industry that held critical patents—with those of iON Worldwide, which brought its expertise in engineering and manufacturing of a rapidly increasing line of wireless and wearable cameras, and which had the platform to grow North American retail distribution. As part of the transactions, Contour transferred to iON Worldwide the "Contour" worldwide trademark, Contour inventory, contour.com, Contour social pages and the Contour e-commerce platform.

17.     The parties also entered into an exclusive, perpetual license agreement between Contour IP and iON Worldwide (as amended, the "License Agreement").  Under the License Agreement, iON was given the right to use certain patents relating to camera technologies.

**Termination of License Agreement**

18.     By notice dated February 2, 2016, as a result of certain alleged defaults, Contour (i) terminated the License Agreement and (ii) redeemed all of the ownership interests held by iON Worldwide in Contour IP Holding.  The Debtors initially disputed the termination and do not believe the License Agreement was lawfully or properly terminated.

5

19.     On February 19, 2016, the Contour parties commenced an action in the United States District Court for the District of Utah-Central Division, seeking, inter alia, a declaration that the License Agreement was terminated, alleging patent infringement, and fraud. Absent a resolution, the Debtors would have used the automatic stay to stabilize their businesses and thereafter, in the appropriate forum, vigorously defend the lawsuit.

20.     After many months of negotiation to resolve the disputes between Contour and the Debtors, an integrated and comprehensive series of agreements were executed that resolved the disputes between the parties.  The result of these agreements provided the Debtors with a clear path for the Debtors to return its attention to the health of the core "iON" model business. While the agreements provided for the return of the "Contour" name and other assets, they provided the Debtors' with a new contractual agreement (including a new license agreement and a modified interest in the funds to be paid to the Debtors on account of a sale of the IP or from the realization of funds flowing from the Go Pro lawsuit) that should enable the Debtors to move forward.

21.     To say the least, these agreements resolved the uncertainty, risks, and mounting litigation costs associated with the Contour litigation.  Perhaps the best result of the resolution with Contour was that the Debtors were able to attract and secure an investor willing to finance the Debtors ongoing business.  The Debtors are now able to sell and develop "iON" branded cameras to be used as sports cameras, wearable cameras, fun cameras, virtual reality, 360 degree cameras and dash mounted in car cameras.  In fact, the Debtors fully expect to launch by the end of the summer a new iON 4K camera that it projects will be state of the art and priced in such a way to compete with Go-Pro.

6

**Patent Infringement Case Against GoPro**

22.    On November 30, 2015, Contour and iON Worldwide jointly filed and served a complaint against GoPro in the United States District Court for the District of Delaware styled, *Contour IP Holding, LLC, et al. v. GoPro, Inc., et al.*, Civil No 1:15-ev-01108-LPS-LJB (D. Del.).   The action is for infringement of U.S. Patent Nos. 8,890,954 ("the '954 Patent") and 8,896,694 ("the '694 Patent") under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq*. (the "GoPro Litigation").   The Debtors believe that the claims asserted in the GoPro Litigation are valid.   As the Debtors no longer hold an exclusive license they were required to be being released as a party to that lawsuit.   However the settlement agreement with Contour protected the Debtors interest in that lawsuit under an agreed waterfall.   This lawsuit is likely years from producing any result and the costs to prosecute same are quite large.

**The Debtors' Prepetition Capital Structure**

*(i)        Senior Secured Debt*

23.    The Debtors and affiliates and Sky Light Holdings, Ltd. ("Sky Light" or the "Senior Lender", as successor in interest to SF IV ION, LLC) are parties to a Credit Agreement, dated as of May 1, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

24.    The obligations owing under the Credit Agreement are secured by a Security Agreement, dated May 1, 2005, under which the borrowers granted Lender a security interest in substantially all of the Debtors' personal property (as defined in the Security Agreement, the "Collateral"). The obligations are also supported by a Guaranty Agreement, dated as of May 1, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the

7

Guaranty") made by Giovanni Tomaselli and Maria McCabe (each a "Guarantor" and collectively, the "Guarantors") in favor of the Senior Lender.

25.     The Senior Lender continued to allege that as a result of Events of Default under the Credit Agreement, the indebtedness owed was accelerated and totaled approximately $5,389,300.89.

26.     Recently, the Senior Lender sold and assigned its interest in the loan to Sky Light Holdings, Ltd. ("Sky Light").   Sky Light has agreed to provide DIP financing and to become the plan funder for the Debtors' chapter 11 cases under the terms of a Restructuring Support Agreement, described below.  Sky Light is also the Debtors main supplier and manufacturer of cameras and products and a significant creditor herein.

*(ii)     Subordinated Kim POV Secured Debt*

27.     The Debtors are also party to various loan agreements and amendments with Kim POV, LLC ("Kim POV").  These loans originated with a secured convertible promissory note dated November 13, 2013 in the original amount of $4,000,000.00 (the "Original Kim Note"). The Original Kim Note was amended and restated from time to time, most recently pursuant to a Second Amended and Restated Secured Promissory Note, dated June 15, 2015 (the Original Kim Note, as amended, restated  the "Amended and Restated Kim Note"). The Debtors converted $2 million of the KIM POV debt to equity and thereafter received additional loans of $2.1 million from KIM POV.   At the time of the conversion of $2 million of the loan to equity, a separate $2 million note held by Mr. Tomaselli was also converted to equity.

28.     The obligations under the Amended and Restated Kim Note are secured by that certain Third Amended and Restated Security Agreement, dated December 29, 2014 under which

8

the borrowers granted Lender a security interest in substantially all of the Debtors' personal property (as defined in the Security Agreement, the "Kim Collateral").

29.    Kim POV has alleged that as a result of Events of Default, the indebtedness owing to Kim POV totals approximately $4,615,237.00.

30.    Pursuant to a Subordination Agreement dated November 13, 2015, Kim POV and the Lender agreed that Lender's debt constituted "Senior Debt" and Kim's advances were deemed "Subordinated Obligations."

31.    The Debtors have total unsecured debt to unaffiliated creditors in an amount of approximately $12.6 million.  The Debtors also owe approximately $7.8 million to non-debtor affiliate, WWL.

32.    As set forth above, recently the Debtors recently entered into the RSA.  Under the RSA, Skylight has indicated that it will fund a plan of reorganization that will permit the Debtors to continue their operations and develop iON branded products. The proposed restructuring reflected in the RSA will: (i) reduce the Debtors existing debt by over $12 million; (ii) provide creditors a meaningful distribution; and (iii) provide much needed working capital to the operations.  The Debtors will seek interim and final orders approving debtor in possession financing and the consensual use of cash collateral.  Such conditional use are conditioned on milestones for achieving the transactions set forth in the RSA.

33.    The Debtors believe that they can restructure their affairs and maximize the value of their assets in these chapter 11 cases.

34.    iON operates in a niche market with a unique business model, making it difficult to match with a potential buyer.  Until a resolution with Contour was negotiated, the challenges

were just too stressful and cumbersome to have any real opportunity to find an investor. Additionally, and making matters worse, was the fact that Stabilis had stopped funding the ongoing operations back in October 2015.

35.     The Debtors reviewed multiple alternatives with its professionals.  The Debtors' objectives included ensuring that it had adequate liquidity, to recapitalize its outstanding liabilities and develop new products.  In light of its business plan and financial forecast, available liquidity, available collateral and asset configuration, among other items, The Debtors have decided to pursue a transaction that would lead to a recapitalization and reduction of its debt level.

36.     The transaction ultimately agreed to provide the Debtors with a significant cushion to execute upon its business plan for the next two (2) years, both with regard to its liquidity needs and for the development of future products.

37.     Recently, the Debtors entered into a Restructuring Support Agreement (together with Exhibits and Attachments the "RSA") annexed as **Exhibit A** .

38.     Under the RSA, the plan supporter agreed to, among other things: (i) vote any claims they hold against the Debtors to accept the Plan and not (a) change or withdraw its vote to accept the Plan, (b) object to, delay, impede or take any action to interfere with acceptance or implementation of the Plan, or (c) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of, or vote for, any restructuring, sale of assets, merger, or plan of reorganization for the Debtors other than the Plan; and (ii) forbear from exercising any rights or remedies under their Credit Agreements.

10

39.    The RSA also provides for various milestones.  The RSA and the obligations of all the parties may also be terminated by mutual agreement between the Parties if these are not timely met.  The consensual restructuring reflected in the RSA will: (i) reduce the Debtors' existing debt by over $15 million and (ii) provide much needed working capital to the operations.

**Evidentiary Support for First Day Motions.**[2]

40.    Concurrently with the filing of its chapter 11 petition, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors operations during the pendency these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on other members of the Debtors' management and the Debtors' professional advisors.

41.    Accordingly, on behalf of the Debtors, I respectfully submit that the Motions should be approved.

### DIP Financing/Cash Collateral Motion

42.    The Debtors have secured debtor-in-possession financing from Skylight in connection with its filing.  The financing has 2 components but is for a total of $1,500,000:  first there will be a loan of money up to $500,000 and secondly up to $1 million in financing will be in the form of new merchandise sold on credit and shipped on 60 day terms.  Without the

---

[2] Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

3737706-4

financing, the Debtors' operations could not be assured of continuing.  With the additional financing in place, and the use of cash collateral, the Debtors believe that they can continue to be current on all its obligations through the plan process.  The financing and consensual use of cash collateral are subject to the following:

      (a)    a plan ("Plan") and disclosure statement ("Disclosure Statement"), the terms of which conform to the Restructuring Support Agreement, shall be filed with the Bankruptcy Court on or before July 12,  2016;

      (b)    Debtors shall obtain Bankruptcy Court approval of the Disclosure Statement as expeditiously as practicable, but in any event no later than August  22, 2016; and

      (c)    obtain Bankruptcy Court approval of the Plan as expeditiously as practicable, but in any event no later than September 29, 2016.

43.    Additionally, the Debtors further request that Bankruptcy Court (a) authorize the Debtors, on an interim basis, use the Cash Collateral on the consensual terms with its senior secured creditor as set forth in the proposed Interim Order; (b) grant adequate protection; (c) schedule the Final Hearing to be held following the entry of the Interim Order; and (d) grant related relief, in each case, on the terms and subject to the conditions described in this Motion and set forth in the proposed Interim Order.  For the reasons set forth in the DIP Financing/Cash Collateral Motion, the Court's approval of this First Day motion is absolutely critical.  Approval of the financing and the continued  use of Cash Collateral will enable the Debtors to pursue a reorganization process, while simultaneously permitting the Debtors to satisfy its current and ongoing operating expenses, including postpetition wages and salaries, utilities, taxes, and

vendor costs.   Absent the financing and the use of Cash Collateral, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to its business, its going concern value and its reorganization efforts.   Accordingly, on behalf of the Debtors, I respectfully submit that the DIP/Cash Collateral Motion should be approved.

Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion").

44.    The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of iON Worldwide Inc., and also request that an entry be made on the docket the chapter 11 case for iON America LLC to reflect the joint administration of these chapter 11 cases.

45.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect iON Worldwide Inc. and iON America LLC. Among other things, the entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections, and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

46.    Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

13

3737706-4

Debtors' Motion for Order Pursuant to Sections 105(a), 363(b), 507(a)(8) and 541 of the Bankruptcy Code (A) Authorizing the Debtors, in their Discretion, to Pay Certain Prepetition Taxes and (B) Authorizing the Debtors' Banks and Other Financial Institutions to Process, Honor and Pay Certain Checks Presented for Payment and Fund Transfer Requests (the "Tax Motion").

47.     The Debtors request entry of an order pursuant to sections 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541, (a) authorizing the Debtors, in their discretion, to pay certain prepetition taxes and (b) authorizing the Debtors' banks and other financial institutions to process, honor and pay certain checks presented for payment and fund transfer requests.

48.     In the ordinary course of business, the Debtors anticipate that they will incur or collect and remit a variety of taxes, including sales taxes, federal taxes and penalties, taxes owed to the Canada Revenue Agency, and California business entity taxes.  The Debtors remit such Prepetition Taxes to the Authorities in accordance with applicable laws.  The Debtors estimate that the total amount of prepetition taxes owing to the Authorities will not exceed approximately $150,000.[3]

49.     In addition, by this Motion, the Debtors request that all applicable banks and other financial institutions (collectively, the "Banks") be authorized, when requested by the Debtors, to receive, process, honor and pay any and all checks presented for payment of, and all fund transfer requests made by the Debtors related to Prepetition Taxes, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date.  In addition, the Debtors also request authority to issue post-petition checks or effect fund transfers to replace

---

[3] Concurrently with the filing of this Motion, the Debtors have also filed a motion seeking authority to satisfy certain obligations relating to prepetition employee wages and benefits, including authority to remit to the applicable taxing authorities prepetition trust fund taxes withheld from employee paychecks and authority to pay the employer portion of payroll taxes as well as certain fees incurred by the Debtors to facilitate payment of such taxes.

14

any pre-petition checks or fund transfer requests on account of Prepetition Taxes that are dishonored, rejected or terminated.

50.     The payment of the Prepetition Taxes is necessary to prevent immediate and irreparable damage to the Debtors' operations and going concern value.  I believe that this Court should authorize the payment of the Prepetition Taxes because: (i) the Prepetition Taxes do not constitute property of the Debtors' chapter 11 estates; (ii) failure to pay the Prepetition Taxes may impact the Debtors' ability to conduct business in certain jurisdictions and their ability to perform under their post-petition agreements; and (iii) the Debtors' directors and officers may otherwise face personal liability.  Absent payment of these amounts, the Debtors may face serious disruptions and distractions.  Accordingly, on behalf of the Debtors, I respectfully submit that the Tax Motion should be approved.

> Debtors' Motion Pursuant to Sections 105(a), (363(b), and 503(b) of the Bankruptcy Code for (I) Authorization to (A) Continue their Insurance Programs, (B) Pay All Obligations in Respect Thereof, and (II) For Authorization for Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Insurance Motion").

51.     The Debtors request entry of interim and final orders pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code (i) authorizing the Debtors to (a) continue their business automobile, excess liability,  directors and officers liability, commercial general liability, and property liability insurance (collectively, the "Insurance Programs"), (b) pay all obligations in respect thereof (the "Insurance Obligations").[4]

52.     Furthermore, as part of their cash management system, the Debtors maintain disbursement accounts at certain banks and other financial institutions (the "Banks").  The

---

[4] Contemporaneously with this Motion, the Debtors are also seeking similar relief for the ability to pay their workers' compensation, life insurance and disability policies.  That relief is sought through the Employee Wage & Benefit Motion.

Debtors draw upon funds in their disbursement accounts to satisfy their obligations arising from the Insurance Programs.  The Debtors request that the Court authorize the Banks to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, on the disbursement accounts to the extent that such checks or electronic fund transfers relate to any Insurance Obligations.

53.     I believe the nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  If the Insurance Programs are terminated or allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ability to successfully reorganize. Furthermore, the Debtors would then be required to obtain replacement policies on an expedited basis at what they expect to be a significantly higher cost to its estate.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

<u>Debtors' Motion Pursuant to Sections 1105(a) and 345(b) of the Bankruptcy Code, Fed R. Bankr. P. 2015 and Del. Bankr. L.R. 2015-2 for an Order Authorizing the Debtors(A) to Continue Existing Cash Management, and (B) To Maintain Existing Bank Accounts and Business Forms (the "Cash Management Motion").</u>

54.     The Debtors request the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor-in-possession accounts, if needed[5]; and (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other

---

[5] In the event the Debtors determine to open any new bank account, such new account shall be made subject to a control agreement satisfactory to the Lender.

documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.

55.    In the ordinary course of business, the Debtors utilize an integrated Cash Management System to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions.  If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Debtors' businesses at this critical time.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

56.    In addition, the Debtors further request that the Court authorize the Banks to: a accept, honor, and rely upon all representations from the Debtors as to which checks should be honored or dishonored consistent with orders entered by this Court, whether the checks are dated prior to, on, or subsequent to the Petition Date and whether or not the Bank believes that payment is authorized by some other order of this Court; provided, that the Bank shall not be held liable for improperly honoring or dishonoring any check, draft, or automated clearing house payment presented, issued, or drawn on the Bank Accounts on account of a claim (as such term is defined in 11 U.S.C. § 101(5)) arising before the Petition Date, which, at the direction of the

17

Debtors was requested to be honored or dishonored, as the case may be, unless the Bank's actions were grossly negligent.

57.     The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of these chapter 11 cases.

58.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 For an Order Authorizing the Debtors to Satisfy Prepetition Claims of Certain Warehouse Liens Pursuant to Section 105(a) of the Bankruptcy Code (the "Common Carriers Motion").

59.     The Debtors seek entry of an order authorizing, but not directing, them to pay, in their sole discretion the valid prepetition claims of the Warehouse Liens relating to storage of product by the Debtors in the ordinary course of business, pursuant to section 105 of the Bankruptcy Code that have accrued and been unpaid as of the Petition Date.  The Debtors propose to pay such claims when, in the Debtors' sole discretion, the Warehouse Liens' exercise of contractual or statutory self-help remedies would unduly disrupt the Debtors' businesses.

60.     The Debtors rely on warehousing and logistics services provided by Weiss-Rohlig USA LLC ("Weiss-Rohlig"), IntegraCore, United Parcel Service, Inc and several of its subsidiaries (collectively, "UPS"), and FedEx Corporation ("FedEx").  Weiss-Rohlig is the main servicer for the Debtors provides international shipments from the Debtors' factory, as well as

18

domestic shipments.   IntegraCore holds and ships goods for the Debtors on a domestic level. UPS is the primary provider of shipping for e-commerce, and FedEx provides shipping services as needed from time to time.

61.    I believe that the relief requested in the Common Carriers Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.   Accordingly, on behalf of the Debtors, I respectfully submit that the Common Carriers Motion should be approved.

Debtors' Motion Pursuant to Sections 1105(a), 363, and 507(a) for (A) an Order Authorizing the Debtors to (I) Pay Wages, Salaries, and Other Compensation, (II) Maintain Benefits, and (III) Pay Reimbursable Employee Expenses and (B) An Order Authorizing and Directing Bank and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing (the "Wages and Benefits Motion").

62.    The Debtors request the authority, in their sole discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Employees and the Benefits.

63.    As discussed above, as of the Petition Date, the Debtors' workforce is comprised of five Employees (the "Employees").   All employees are paid on salary basis.   The Employees are employed through a Professional Employer Organization (the ("PEO").

64.    The Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.   Consequently, the Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.   Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when

19

Employee support is critical to the Debtors.  In the absence of such payments, the Debtors believe their Employees may seek alternative employment opportunities, thereby hindering the Debtors' ability to meet their customer obligations and likely diminishing creditors' confidence in the Debtors.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

65.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

66.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: June __, 2016
       Moorestown, New Jersey

_____
                    Chris Oatway
                    Chief Financial Officer
                    iON Worldwide Inc.

20

3737706-4