UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                    |   |                              |
|--------------------|---|------------------------------|
|                    | . | Chapter 11                   |
| IN RE:             | . |                              |
|                    | . | Case No. 16-11543(LSS)       |
| ION WORLDWIDE, INC, et al, | . |                      |
|                    | . | Courtroom No. 2              |
|                    | . | 824 Market Street            |
|            Debtors.| . | Wilmington, Delaware 19801   |
|                    | . |                              |
| . . . . . . . . . . . . . . . . | . | Wednesday, September 21, 2016 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:                Anthony M. Saccullo, Esq.
                                A.M. SACCULLO LEGAL, LLC
                                27 Crimson King Drive
                                Bear, Delaware 1701

                                Michael S. Fox, Esq.
                                Jonathan T. Koevary, Esq.
                                OLSHAN FROME WOLOSKY, LLP
                                1325 Avenue of the Americas
                                New York, New York 10019

For the Official Committee
of Unsecured Creditors:         William M. Alleman, Jr., Esq.
                                Kevin M. Capuzzi, Esq.
                                BENESCH, FRIEDLANDER, COPLAN
                                 & ARONOFF, LLP
                                222 Delaware Avenue, Suite 801
                                Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator:                 Electronically Recorded
                                by Michael Miller, ECRO

Transcription Company:          Reliable
                                1007 N. Orange Street
                                Wilmington, Delaware 19801
                                (302)654-8080
                                Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES:   (Continued)

For Skylight Holdings,
Limited:                      L. Katherine Good, Esq.
                              Christopher M. Samis, Esq.
                              WHITEFORD TAYLOR PRESTON, LLP
                              The Renaissance Centre, Suite 500
                              405 North King Street
                              Wilmington, Delaware 19801

APPEARANCES VIA TELEPHONE:

For the U.S. Trustee:         David Gerardi, Esq.
                              OFFICE OF THE U.S. TRUSTEE
```

INDEX

                                                      Page

MOTION TO APPROVE DISCLOSURE STATEMENT                 5

BAR DATE MOTION                                       29

1          (Proceedings commence at 11:03 a.m.)

2                THE COURT:  Please be seated.

3                UNIDENTIFIED:  Thank you.

4          (Participants confer)

5                THE COURT:  Mr. Saccullo.

6                MR. SACCULLO:  Good morning, Your Honor.  Anthony

7     Saccullo on behalf of the debtors.

8                Your Honor, in speaking with chambers, I believe Your

9     Honor received our binders with an amended agenda this morning.

10               THE COURT:  Yes.

11               MR. SACCULLO:  It, basically, amended literally

12    everything that Your Honor has before her today, both the bar

13    date order, first amended plan, first amended disclosure

14    statement, and a solicitation procedures order, which is red-

15    lined, as well.

16               The bright side is, Your Honor, that means that peace

17    has violently erupted in this case, and we hope that this

18    hearing is a nice, uncontested little stroll to bring us to

19    solicitation to a plan.

20               Your Honor, we do have -- there are two documents that

21    Your Honor does not have a red-line of; that would be the first

22    amended plan versus the plan, and the first amended -- the

23    disclosure statement with regards to the first amended plan,

24    versus the original disclosure statement.  We will -- I believe

25    Mr. Fox will be handing those two documents up.

1          The red-line orders are attached to my certification

2     of counsel at Exhibit B for both, so those are still the

3     operative red-lines.  We have nothing further, after last

4     night, that we submitted those.

5          THE COURT:  Okay.

6          MR. SACCULLO:  Your Honor, with that, I would cede the

7     podium to Mr. Fox.

8          THE COURT:  Thank you.

9          MR. FOX:  Good morning, Your Honor, Michael Fox on

10    behalf of Olshan Frome, counsel for Ion Worldwide and Ion

11    America.  With me is Jon Koevary.  And also in court, to the

12    extent that Your Honor wants a proffer, I have Chris Oatway,

13    the CFO, present in court.

14          But as Mr. Saccullo said, you know, even though the

15    shortest distance between two points is a straight line, I

16    think this Court -- this case, relatively, stayed on a straight

17    line.  And I thank the parties that are around this table today

18    to get there, which -- being the committee counsel, and most

19    importantly and impressively is our plan sponsor, who showed

20    some flexibility, when I didn't believe that they were going to

21    show flexibility.

22          So what I'd like to hand up is the red-lines of the

23    plan and disclosure statement.

24          THE COURT:  Thank you.

25          MR. FOX:  And to save Your Honor from having to turn

1    page by page, we can tell you that we circulated these red-

2    lines to the committee, to the plan sponsor, and to the U.S.

3    Trustee, who have signed off.  An of course, yours is the most

4    important sign-off.  But let me tell you how the plan changed

5    because it didn't change drastically; it changed subtly.

6                THE COURT:  Uh-huh.

7                MR. FOX:  The plan became a pot plan.

8                THE COURT:  Uh-huh.

9                MR. FOX:  So, therefore, instead of having a number of

10   having to be -- to have either a -- the lesser of 15 percent or

11   2.505, it's now the pro rata share of a pot of 2.605.  So the

12   committee was able to increase that pot.

13               They also increased the pot from the following

14   contingent asset that we hope hits at some time, which is the

15   GoPro litigation.

16               THE COURT:  Uh-huh.

17               MR. FOX:  It's kind of -- the GoPro litigation kind of

18   put us in a funny spot because, if we say that the GoPro

19   litigation is worth so much money, we think GoPro would have

20   objected because there's a lawsuit, and we certainly don't want

21   to interfere with that lawsuit, nor do we want to be too

22   optimistic because I can tell you that, when we were a

23   plaintiff in that lawsuit -- "we" being Ion -- we were nowhere

24   close to a settlement or seeing a settlement.

25               On the other hand, if we take a negative approach,

1    saying it's worth nothing, Contour, who's prosecuting the

2    lawsuit --I don't know if -- yes, they're in court today --

3    they would say, what are you doing, you're jeopardizing a

4    material asset for us.  So we did put language in the

5    disclosure statement that kind of discussed a possibility or

6    the cap of it hitting in some time.  And I did preview that

7    particular language with Contour and their counsel, they

8    approved it.  So I really don't think I have anybody here,

9    other than Your Honor, that would have some comments on it.

10            Some of the other changes were technical.  The

11    intercompany claims, if it was not clear before, it's now clear

12    that the receivable that we may have from one end, and the

13    payable on the other, are going to be washed out.  All the

14    stock is going to go to our plan sponsor; they'll own a hundred

15    percent.

16            I believe the $12 million that they had committed to

17    under the RSA will not have to be increased because of the

18    efficiency of this case.  There were some administrative

19    numbers, including fees to my firm, Mr. Saccullo, and the

20    committee that were going to come under budget.  Rarely do you

21    have lawyers telling you, gee, Your Honor, we -- the carveout

22    is not enough, we need more.  Here, I think things just worked

23    smoothly because it is a small entity, and there's five

24    employees.  We really were able to concentrate and work

25    effectively.

1          There's two things that are missing, and I don't know

2     if "missing" is the right word.  I don't know whether the

3     committee is going to give us a support letter, and I've asked

4     them, and if they do, we have to have that approved because I -

5     - it was a constant -- and you saw in their objection we had

6     bracketed it.  Well, I had bracketed it because I can't commit

7     to whether they were going to support the plan, as of the time

8     we filed the plan, we didn't, but being an optimist, I assumed

9     maybe we would, and I am now correct.  But that is separately

10    and apart from the plan support letter that the committee would

11    have.

12         We got, last night -- the other thing that's missing

13    is our valuation.  Now I have it, Your Honor.  The problem is,

14    I know we had it last time, with getting the exhibit to you,

15    and we had to go through a few things, is that, when it was

16    sent to me and I looked at the numbers, I don't disagree with

17    any of the numbers.  But on the bottom, it says "preliminary

18    incomplete work product draft."  I got to get that off; I got

19    to get them to resend it, and we will submit it as part of --

20         THE COURT:  Okay.

21         MR. FOX:  We'll submit it as an exhibit to this

22    hearing no later than today because -- or possibly tomorrow at

23    noon because one of the principals is traveling, and I want to

24    make sure he's okay with it.

25         THE COURT:  Uh-huh.

1          MR. FOX:  And we would, hopefully, if Your Honor will

2    allow us to then solicit, we would want to solicit no later

3    than Friday, so we can hold this case to a confirmation by

4    October 31st.

5          And that date is important, not because it was in the

6    RSA, because the RSA had a different date, a much earlier date.

7    But one of the reasons that you need to get out of Dodge in

8    this case is there are many shows.  And if you see what's going

9    on in TV, as I gave to you the -- when I first asked you, do

10   you know what Ion is, and I said, do you know what GoPro is.

11         THE COURT:  Uh-huh.

12         MR. FOX:  Well, last night, watching TV, I saw the

13   GoPro drone.  Ion is going to have a drone, okay, or a camera

14   that's going to work.  If you watch sports, like I do, all of a

15   sudden, during a half-time show, I see the Samsung --

16         THE COURT:  Uh-huh.

17         MR. FOX:  -- virtual reality glasses.  These are all

18   the things that our plan sponsor sees in Ion's ability to

19   manufacture, and hopefully market.  And they're not now, but

20   they need time.  And there's a show coming up, I think in

21   November, early November, and we need to be at that show, ready

22   and able to take orders from the people we want to sell with.

23   So that was really working backwards, the goal of why we need

24   to be out of -- we would like to be a successful confirmation

25   of a plan.

1        So, if Your Honor wants me to walk through -- I think

2   I've walked through the highlights of the plan and disclosure

3   statement.  I'm pretty bad in really going over some of the

4   numbers.  But can see the debt to the GUCs were -- you know, we

5   were able to state it at now 15.8 million, not 15.7.  But there

6   was no other substantive changes, other than the economic ones

7   that I've described to you.

8        And obviously, wherever those are changed in the

9   disclosure statement, we would have changed it in the plan, so

10  to make sure that, once we get our disclosure statement

11  approved, the plan tells you how you're going to distribute the

12  money.

13       We're confident that the plan will be successfully

14  promulgated.  I know we haven't done any pre-solicitation, but

15  I just know, based on the liquidation value, if the creditors

16  didn't take this case, there would be no recovery at all

17  because the secured creditor and the second-tier secured

18  creditor, who has really made this case possible, Kim LTV [sic]

19  she's taking a haircut.

20       And since she's taking a haircut on her second

21  position, to the extent that she was fully secured and her UCCs

22  have been filed in the right places, there would be no

23  recovery.  So she's taking 3 million on a four-point-something-

24  million-dollar secured claim, and the GUCs are going to get

25  their pro rata share of a maximum of 2.705, so --

1          THE COURT:  The GoPro recoveries stay with the

2    company?

3          MR. FOX:  Yes, the GoPro -- no.  The GoPro recoveries

4    will go to NewCo, to the reorganized Ion.

5          THE COURT:  Uh-huh.

6          MR. FOX:  The first 100,000 that's ever realized will

7    go and remain property, subject to a further distribution,

8    because the 2.605, let's assume there was no claims objection,

9    you know, the claims came in and they were material.  We could

10   distribute that by the end of the year.

11         I stand here today, telling you, Your Honor, that

12   there is no probability, no likelihood of a GoPro realization

13   for three or four years, at best.  And under the contribution

14   agreement, while it sounds like a large amount, and the right

15   to get a waterfall up to 28 million is significant, but if it

16   happens in three or four years, the plan sponsor, you know,

17   Terry [sic] -- the -- Sky Light, will have already invested in

18   this company 12 million to get it out of bankruptcy, and

19   probably another five to 10 million a year in investing in

20   different ventures to get there.

21         So it's not like it's a terrific win-win for them

22   because one of the things that happens, if there's a harvesting

23   in three or four years, I lose my license.  I lose the ability

24   -- Ion -- Reorganized Ion will lose the very asset that's

25   important, which is the intellectual property, subject to the

1   Contour license agreement.

2          THE COURT:  Uh-huh.

3          MR. FOX:  And until technology -- until there's

4   another technology -- and technology always has a limited

5   usefulness in the world, I don't think anybody's technology

6   except for maybe Coca-Cola's secret, you know, lasts more than

7   five years.  You know, today -- in this word, today's

8   technology is tomorrow's obsolescence.

9          So we hope, by the time we get there, within five

10  years, and the intellectual -- the license is only limited on

11  products sold on the United States.  But it's important in

12  today's Me Generation of Millenials that the property -- the

13  camera talks to your phone, the camera talks to your computer.

14         THE COURT:  Uh-huh.

15         MR. FOX:  That's the hands-free part of what the

16  Contour has.

17         GoPro has been in violation of it, and there's a

18  pending lawsuit, as I stated, and I -- you know, it's kind of

19  bittersweet, whether I'm rooting for it or rooting against it.

20  I only hope it -- you know, our only belief is that, if it does

21  happen in five years, we get our money, we've already paid the

22  creditors.  And you know, either we could make a deal with

23  whoever buys the license, because that's part of the

24  realization, or there will be some other technology, you know,

25  in play, that will enable that.  But that won't be Your Honor's

1  problem because we'll have fully consummated our plan with our

2  creditors.

3       THE COURT:  So the question I have is the question

4  that was raised by the committee, that -- and raised by the

5  fact that the bar date motion is also on for today, which is:

6  Are we okay soliciting the plan when we have not had a bar date

7  yet, and there may be creditors out there who would file proofs

8  of claim, who are not going to be able to vote?

9       And I think that has other implications, too, for

10 dischargeability and successor liability, if people come

11 forward after confirmation, or maybe before confirmation, but

12 without notice and without an opportunity to have voted.

13      MR. FOX:  Well, Your Honor, I understand due process,

14 and I'm probably not a big proponent of it all the time, but I

15 certainly understand it and I'm sensitive to it today.

16      THE COURT:  I'm a big proponent of it.

17      MR. FOX:  I understand that, that's why I had to say -

18 -

19      THE COURT:  All the time.

20      MR. FOX:  I got it, I've been told by everybody in

21 Delaware that Your Honor is going to have raised that, and I'm

22 prepared to address it --

23      THE COURT:  Okay.

24      MR. FOX:  -- that we believe that we have notified

25 everybody, you know, that's out there.  And to the extent that

1    we go out and solicit, one of the things of having a pot plan,

2    as opposed to a percent plan, we think moots out the argument

3    because, once we get the claims universe, we won't be making

4    the first distribution until after the -- beyond the bar date,

5    which will have a time period.

6          THE COURT:  But that works for distributions.  But how

7    does that work for voting?

8          MR. FOX:  Well, again, Your Honor, I only -- this is

9    not Golfsmith, this is Ion, so we have a handful of creditors

10   that we've known -- done business with.  We're relatively

11   certain to take on that risk, and ask Your Honor to understand

12   that the universe out there -- we've been in touch -- and if we

13   have done business with you, they're on our -- and we owe you

14   money, they're on our list.

15         I can't wait, and I got a plan -- as I explained to

16   you, my plan sponsor has given me date where I got to get out

17   of Dodge.  I think that's why they were flexible in meeting the

18   committee's demands and resolving that objection.  Having said

19   that, that's the committee's position.  I need Your Honor's

20   approval --

21         THE COURT:  Uh-huh.

22         MR. FOX:  -- to go out and solicit.  So I don't

23   believe that's an impediment, you know, the way we view it

24   because we're -- it's not like we have 3,000 creditors.  We

25   don't even have a claims agent because our universe of people

1    that we do business with is small.  And the universe within the

2    last year, prior to the filing, was even smaller because we

3    were constrained, as Your Honor may recall, with no money,

4    Stabilis froze us, and Contour was suing us.  So the company

5    really didn't do business with a lot of people during the time

6    period that we would say was unknown.

7          And but for the fact that we were able to go into

8    bankruptcy, find a plan sponsor and proceed, gives us the

9    comfort that we should proceed -- I see my plan sponsor up, and

10   I would like to see if he could add something before I finish.

11         THE COURT:  Before I hear Mr. Samis, how many people

12   on this -- how many creditors on the schedule are scheduled as

13   disputed or contingent or --

14         MR. FOX:  Well, the --

15         THE COURT:  What's the other one?  I forget.

16         COUNSEL:  Unliquidated.  Unliquidated.

17         THE COURT:  Unliquidated.

18         MR. FOX:  Very few.  There are -- the ones that were

19   disputed were Contour because, as of the time we filed, we

20   weren't sure where their agreement would have -- the creditors

21   that they listed of Dorsey & Whitney not being on, they're on.

22   They just didn't look in the right place.

23         The two other law firms that -- I mean, now we're

24   getting nervous, and that -- this -- I'm happy to address it.

25   You know, how do we know what our claims universe is, and why

1    do people file claims if they're not on your schedules, how can

2    I have some reliability?

3        They emanated from a capital raise, which we never

4    retained -- we never went forward with, from some Canadian

5    investment bankers that raise money.  And as part of their

6    agreement, we had to pay their counsel.  So we were never

7    invoiced, we never received anything.  Yes, we did sign an

8    agreement that we would be responsible; we never had a number.

9        So the fact that there are some -- two or three

10   creditors that have filed claims, that we don't know, I've

11   given you -- and I've asked my client what the -- you know,

12   what the answer is, because I needed to be prepared today.  The

13   ones that are disputed, you know, are really the Contour-

14   connected creditors.  The ones that are unliquidated, I'm not

15   aware of many.  Okay?  Of unliquidated claims.  They could --

16   I'd have to refresh my -- the -- there's one of them?

17       (Participants confer)

18           MR. FOX:  Four of them?

19           MR. SACCULLO:  Forty-one.

20           MR. FOX:  Forty-one?  Okay.  That's a significant

21   number.

22       (Participants confer)

23           MR. FOX:  Oh, okay.  Well, Your Honor, not to give you

24   the wrong information, if Mr. Saccullo could better address

25   that question, I would prefer not to read sign language because

1    I don't have my glasses on.

2        (Laughter)

3        MR. SACCULLO:  Still good morning, Your Honor.

4    Anthony Saccullo on behalf of the debtor.

5        Our client was able to do a quick one-two-three-four

6    to get to 41.  Your Honor, that includes contingent,

7    unliquidated, and disputed.  One thing that Your Honor should

8    keep in mind is, if a portion of a claim was disputed; in other

9    words, we received an invoice that we know that invoice is

10   disputed, that creditor would have been listed as disputed,

11   subject to the proof of claim being submitted.

12       That being said, Your Honor, if the -- certainly, I

13   believe, in just about every case, we rely, when we look at

14   "all creditors," is that is defined as all creditors need to be

15   solicited.  We rely on the debtor's books and records and we

16   rely and the schedules and statements and the creditor matrix

17   formed by the books and records to give us all creditors.

18       If we didn't do that, we would never be able to do

19   pre-packs.  If we didn't do that, we would never --

20       THE COURT:  But pre-packs --

21       MR. SACCULLO:  -- be able to solicit --

22       THE COURT:  -- are usually a hundred cents on the

23   dollar, so maybe we aren't as concerned about pre-packs.

24       MR. SACCULLO:  Perhaps, Your Honor, but not

25   necessarily always.  I mean, if the answer that we need here

1    is, go ahead and solicit the contingent, unliquidated, and

2    disputed, and we can handle this all at confirmation through

3    3018 and through allowance for voting purposes only, I think we

4    could certainly make that happen, as well.

5         THE COURT:  Well, and see that's what I'm just trying

6    to figure out.  So we don't have a bar date, people haven't

7    filed proofs of claim, they don't have to have filed proofs of

8    claim yet because no bar date has been established.  They --

9    you've listed certain as disputed, whereas, if they had filed a

10   proof of claim, that would take precedence, and they would be

11   solicited and able to vote.

12        There's no 3018 process envisioned in your procedures,

13   and there's no 3018 process envisioned for schedules, for that

14   matter.  So how are people supposed to know how you have them

15   scheduled, whether they should be in here contesting anything?

16   I don't know.  I'd like to hear, I'd like to hear more because

17   we gave this some thought in chambers.  But I have to say, I

18   haven't seen it before.

19        MR. SACCULLO:  Your Honor, I do believe, in our

20   solicitation order that we submitted to the Court, we do have a

21   3018 deadline, which contemplates the ability to move for a

22   temporary allowance of your claim.  If the answer is we need to

23   move that --

24        THE COURT:  But people --

25        MR. SACCULLO:  -- a little bit earlier --

1      THE COURT:  -- didn't file proofs of claim, there's no
2    objections to people's proofs of claim.  That's what 3018
3    contemplates.  3018 is to enfranchise people who file proofs of
4    claim, and then the debtor filed an objection, and it's to
5    enfranchise them, so they can vote.  But here, that's not
6    what's happened.  The debtor has listed them, maybe properly,
7    as disputed, unliquidated, contingent.  And what's there to
8    come in on?
9      MR. FOX:  It's a balancing, Your Honor, I understand.
10   There may be, to the extent -- because we're confident we've
11   covered them, and I'm relatively comfortable that the votes are
12   going to be meaningful.  But if a creditor raises this, or a
13   party raises this, is it -- can we not deem it to be a
14   confirmation issue, and hopefully, by then, we could have
15   either allowed their claim or not allowed their claim, since
16   they will have seen it?  We're certainly not precluding any
17   creditor or any party from objecting to confirmation.
18      So, while I think I understand the sensitivity, the
19   balancing of us having to get out of Dodge, the fact that the
20   committee has gotten on board -- and I know some of the other
21   large creditors, you know, DeFrancesco is a million dollars,
22   Kim PDV [sic] has a 4.7-million-dollar.  I'm pretty comfortable
23   that, with the committee's support and the creditors' support,
24   that there's nobody out there that I owe any kind of
25   significant money to that would prejudiced.

1          And if they do come in, let's deal with it at

2     confirmation, or perhaps -- what would be their objection?

3     They don't have the information, they need more information.

4     Maybe we could deal with them one on one.  I don't think it's

5     going to be a Pandora's Box, where we're going to deal with

6     hundreds of creditors from an entity that we did business with.

7          You know, I believe we've captured them all, and the

8     reason it's disputed is because I'm not sure that anybody's

9     books and records are ever perfect.  You know?  But that's why

10    we'll have a claims objection process.

11         But if there are creditors out there, and I submit

12    parties out there, five, six, ten, a hundred, come in and

13    object to confirmation, I have a much harder step to climb

14    over.  But I'm confident that we don't have those parties out

15    there.  And in balancing, you know, all the equities of how

16    much we really need to be out of bankruptcy, the economics of

17    what they're getting, if there's a universe of people that I

18    don't know -- that my client doesn't know about, you know, to

19    quote "Apollo 13," "Houston, we got a problem."

20         But they're comfortable that they have captured the

21    universe of parties that are out there.  And if there are five

22    or six or ten that file objections to confirmation, then I have

23    -- I concede I have -- may run the risk of having to re-

24    solicit.  But I'd rather run that risk than slow the process up

25    for another 60 days.  I can't -- they can't do that.

1        And my plan funder, I don't believe will be that

2   patient.  We -- under our RSA, they gave us until the end of

3   September.  Unfortunately, I got the flu, and I really didn't

4   work for two weeks, and that's one of the reasons that the case

5   is beyond the original milestone in the plan -- in the

6   restructuring support agreement.

7        So I understand it.  And I would rather run the risk

8   of having to re-solicit, if there were creditors out there that

9   objected on grounds of due process, than to slow this up for --

10  you know, until -- October 21st is the bar date, if I'm not

11  mistaken, and that's just too long.

12       THE COURT:  Mr. Samis.

13       MR. SAMIS:  Your Honor, good morning.  Chris Samis for

14  the plan sponsor.

15       I just wanted to buttress a couple of Mr. Fox's

16  statements.  You know, we've, obviously, dilligenced this

17  company.  We are confident that they are aware and have been

18  communicating with most of the creditors.  Most of the

19  creditors are scheduled.

20       The bar date notice will be going out with the

21  solicitation package.  There is some time between now and the

22  proposed confirmation date of October 31st, where, you know, we

23  expect that anyone with a serious claim would probably wash in

24  between now and then.

25       We do understand that this isn't an ideal

1  circumstance; however, we are where we are.  As Mr. Fox said,

2  these trade shows are important.  My client came in, you know,

3  to this case with the case premised on a time line.  We're

4  trying to commit to that time line.

5      We think the due process considerations that are at

6  issue here are certainly serious, and we respect them.  What

7  we'd like to see happen, though, is this become a confirmation

8  issue, as Mr. Fox said.  Ultimately, if there are objections

9  because people feel like the solicitation process was, you

10  know, problematic in some way, we'll hear about it then.

11      But we are confident that the universe of creditors

12  here is known, largely known, and that there isn't going to be

13  a material impact on voting.  The pot plan has corrected things

14  from an economic perspective, for recoveries, and the committee

15  is on board with that.

16      So, with all of that, I recognize this isn't a perfect

17  case and a perfect scenario, but we think that there is enough

18  there to make this the exception to the rule.

19      THE COURT:  Okay.

20      MR. ALLEMAN:  Good morning, Your Honor.  Bill Alleman,

21  Benesch Friedlander --

22      THE COURT:  Mr. Alleman.

23      MR. ALLEMAN:  -- on behalf of the committee.

24      I'm not going to -- I'll be brief.  I don't have very

25  many points to add to what Mr. Samis and Mr. Fox and Mr.

1    Saccullo have made, to argue against my points.

2            But the committee has gotten comfortable that the

3    disclosures and the revised terms of the plan have tilted the

4    balance from where we were a couple of days ago, which is we're

5    not quite sure what the claims pool is, we're not quite sure

6    what people are getting.  We think everyone, or at least the

7    biggest group of creditors should have an opportunity to vote

8    on this plan.

9            The disclosures that the debtors have made have gotten

10   us comfortable that they understand and creditors will

11   understand the claims that are out there.  The improved

12   economic terms, including the fixing of the pot, we believe

13   alleviate our process concerns, as well.

14           And given the posture of this case and all of the

15   circumstances, the committee was comfortable that shifting

16   these issues to a confirmation issue made sense, and that they

17   were willing to go forward on that basis because they do think

18   that the plan, as proposed, will provide a meaningful recovery,

19   an improved recovery from what it was.

20           And obviously, the debtor will have to meet its

21   requirements under 1129.  We'll be back here, if need be.  But

22   based upon the information we've been provided and the

23   improvements that have been made to the plan, we don't expect

24   that to be an issue.

25           THE COURT:  Okay.

1          MR. SAMIS:  Your Honor, Chris Samis again.

2          I'd only make one more comment.  Just so it's clear,

3    and I think it's probably obvious, but we're -- we, to some

4    extent, are also putting our money where our mouth is here.

5    You know, obviously, if there are creditors that weren't

6    solicited who didn't have an opportunity to address the

7    releases and things like that, we'd be shouldering that burden

8    on the other side.  So there is risk that my client is taking,

9    and we've become comfortable with that risk.  I just wanted to

10   make it clear that we are -- you know, we're sharing in that.

11         THE COURT:  The release and the discharge.

12         MR. SAMIS:  Correct.  Thank you, Your Honor.

13         THE COURT:  Uh-huh.

14         MR. FOX:  Well, I hope Your Honor has heard the

15   lawyers' positions and can get comfortable.  As I was in front

16   of Judge Walrath last week, every judge can be afraid that

17   somebody is going to say, well, you did this in Ion, why won't

18   you do it for me in another case.  And as she aptly put it,

19   every case is a case by case, and she doesn't care what was

20   ever done in an order, she would want to find out the facts and

21   then the standard.

22         And I hope Your Honor will understand, I'm not using

23   this to set a new precedent in Delaware; I'm doing this because

24   of the exigencies of the case, and the need to get out of

25   Dodge.  And as you just heard the plan sponsor say, they're

1    willing to and understand the risks on the release and the

2    discharge.  You know, we're comfortable, they're comfortable,

3    the committee is comfortable.  We just hope Your Honor can give

4    us the benefit of the doubt.

5         THE COURT:  It's not a question of giving you the

6    benefit of the doubt; it's a question of what the code

7    requires.  And quite frankly, I'm not a hundred percent

8    positive about what the code requires.  Section 1126(a) says:

9              "The holder of a claim or interest allowed under

10             Section 502 may accept or reject the plan."

11        And 502 talks about a claim or proof of interest is

12   allowed when it's filed under 501, unless someone objects.  And

13   501 talks about filing a proof of claim.

14        So, when you're looking at who's entitled to vote, it

15   at least assumes, but may not requires, at least assumes that

16   people who file proofs of claim should be entitled to vote,

17   which suggests, but may not require, that you have to have the

18   bar date in place.

19        MR. FOX:  Well, Your Honor, given even the

20   governmental bar date is not until December --

21        THE COURT:  I get that.

22        MR. FOX:  -- we have --

23        THE COURT:  And we thought about that in chambers.

24   I'm not sure.  So here's what I'm going to do.  I think we have

25   discussed the risks that the buyer will be taking, if somebody

1    comes in after -- maybe not even after confirmation, I'm not

2    sure where that risk lies, what the divider line is.  But we've

3    talked about those risks, they're out there.  I'm not making

4    any kind of an advisory ruling on what-if scenarios, just

5    they're a possibility.

6            MR. FOX:  Well, Your Honor, the bar date does expire

7    on the 21st, so we'll at least be in a much better position to

8    see if there are claims out there --

9            THE COURT:  Right.

10           MR. FOX:  -- on the 21st, which is prior to the 31st.

11           THE COURT:  So I'm going to permit it to go out.

12    We'll see what happens with the bar date.  I don't know how

13    many people were scheduled.  I know 41 were scheduled as

14    disputed, contingent, unliquidated.  I don't know what the

15    universe was.  You might consider serving everybody.

16           MR. FOX:  I think that's an excellent idea.

17           THE COURT:  And we'll see where it shakes out when we

18    get to --

19           MR. FOX:  The confirmation, or the next date, you

20    know, which I hope -- Your Honor, I'm here.  If I'm on the

21    21st, and I see something way different than I see today, I

22    understand the risk, and I'm not going to go forward on the

23    31st, with a plan that I know is patently unconfirmable because

24    of due process.  I'm not going to be the first lawyer thrown

25    out of a Bankruptcy Court; I'm not going to be the last one,

1    but I don't want to be any -- I don't want to be thrown -- I

2    want to watch the door when I open it and when I close it, and

3    I know what risks I have as an officer of the Court, practicing

4    in -- before this Court for over 30 years.  So I'm not trying

5    to create a new precedent; I'm really just trying to balance

6    the issues that I have here.

7         And if this was a hundred-million-dollar or a billion-

8    dollar entity, with thousands of employees across the country,

9    I have -- I don't think I'd be here today.  But knowing that I

10   have five employees, the business was on hold for a while

11   because of circumstances beyond their immediate control, and we

12   now have an opportunity to hopefully see a more brighter

13   future, we believe we've covered -- I've gone over this, I've

14   pushed Mr. Oatway, I've pushed Mr. Giovanni to make sure that

15   we're not missing anybody because, if we are, that's going to

16   present a problem.

17        One of the things the committee insisted on, and we

18   gave them, was an opt-out on the ballot.  So we're not trying

19   to force anything on people; we're trying to get a plan

20   confirmed.  And I think the best look-see will be on the 21st,

21   right after.  And you know, obviously, we'll all collectively

22   hear Your Honor, and hopefully, it's a non-event because

23   there's not going to be issues or creditors out there that we

24   didn't solicit.

25        THE COURT:  Okay.  So I will approve the revised

1   disclosure statement, and I will need to take a look at the bar

2   date order, as revised.

3        MR. FOX:  Okay.  Well, we didn't even present the bar

4   date to you, but -- yet.  I mean, Mr. Koevary will do that.

5        The only thing I understand is that, if everything

6   goes forward, we're here on October 31st, which I know is a

7   big, busy Golfsmith date.  So we'll take any time Your Honor

8   has, if that works.  And you know, although, if it's early,

9   it's fine, we'll just sleep over and, you know, we'll come

10  down.

11        THE COURT:  Yeah, let's do it early.

12        MR. FOX:  How early?

13        THE COURT:  Let's do it --

14        MR. FOX:  Your Honor, any time is fine.

15        THE COURT:  No, I'm not sure what time I gave

16  Golfsmith.  Let's do it at 9:30.

17   (Participants confer)

18        MR. FOX:  Well, Your Honor, I'd like to hand up the

19  order, but unfortunately, I've -- I thought this was mine, so I

20  wrote in 9:30 on those two dates, but, you know ...

21   (Participants confer)

22        THE COURT:  No, that's fine.

23   (Laughter)

24        MR. SACCULLO:  That's what they reflect.

25        THE COURT:  Okay.  Let's see what we got.

1          MR. FOX:  At least my numbers purport to be 9:30.

2          THE COURT:  Yeah, that's fine.

3          MR. FOX:  Okay.  I appreciate Your Honor's help today.

4    That's the one thing that I know, we want to go over the bar

5    date motion, and I'd like to hand over that to Mr. Koevary.

6          THE COURT:  Okay.

7     (Participants confer)

8          THE COURT:  Do I have that in the binder?

9     (Participants confer)

10         MR. KOEVARY:  Thank you, Your Honor.  Jonathan

11    Koevary, Olshan Frome Wolosky, for the debtors.

12         Your Honor, I think the bar date is pretty

13    straightforward.  We're talking about the date being October

14    21st.  If we serve it today -- and I think we can; we basically

15    have the standard Delaware form, which is 30 days after the

16    service date, so we're going to make every effort to make today

17    the service date.  And then that would be -- September is a

18    thirty-day month, so that would make October 21st the actual

19    general bar date.

20         No other changes, as Your Honor mentioned.  As was

21    discussed earlier, December 21st is the 180 days following the

22    petition date, so that's the governmental bar date, Your Honor.

23    And what we had in this motion, at the request of certain

24    parties, is that we also have an administrative claim bar date

25    through -- for administrative claims through August 30th, so --

1   or August 31st, rather.  So they have until October 28th.

2          So this is -- has more than the typical bar date order

3   because, usually, the only administrative claims that you'll

4   see is 503(b)(9)'s, but it's becoming more and more of a

5   practice, and on the request, we put this here, too, that at

6   least we will know if anyone come out of the woodwork that

7   we're not expecting, we have the additional October 28th date

8   in there, as a -- as the last date to file administrative

9   claims, other than professional fees, that is, that accrued

10  through August 30th -- 31st, rather.

11         And with that, we will -- we just brought in a few

12  comments from parties, including making clear that the proofs

13  of claim may be e-filed.  That wasn't clear in our motion, but

14  that's a correction.  And those are really just the substantive

15  changes since the motion that we filed, Your Honor.

16         THE COURT:  Okay.  Do we know -- and I just don't know

17  -- that we can use the Clerk's Office for filing in Chapter

18  11's, as opposed to 7's?  Okay.

19     (Participants confer)

20         MR. SACCULLO:  Your Honor, just to put your mind at

21  least, proofs of claim have already started coming in.  They're

22  going into the Clerk's Office, the Clerk's Office is putting

23  them right onto --

24         THE COURT:  They upload them.

25         MR. SACCULLO:  -- a claims docket, so it's all being

1    kept.  And actually, they recorded both on the docket, so that

2    we know it's there, and they're also keeping a claims register.

3         THE COURT:  A separate claims register, okay.

4    (Pause in proceedings)

5         THE COURT:  Okay.  I will sign that order.

6         MR. KOEVARY:  Your Honor, I'm just trying to -- thank

7    you, Your Honor.  I'm just trying to -- I thought I had a

8    physical order in my hand, but it's not; it's a red-line.

9    (Participants confer)

10        MR. KOEVARY:  May I approach, Your Honor?

11        THE COURT:  Yes.  Thank you.

12   (Pause in proceedings)

13        MR. KOEVARY:  All right.  So, Your Honor, I just

14   handed up the proposed order for Your Honor's signature.

15        THE COURT:  Okay.  That order is signed.

16        I'm going to go back and look at the disclosure

17   statement for a minute, for the procedure.

18   (Pause in proceedings)

19        THE COURT:  So is it anticipated that the ballots are

20   going to have the amount of the claim on it?

21        MR. KOEVARY:  No, Your Honor.

22        THE COURT:  The ballots will not.

23        MR. KOEVARY:  Correct.  So the ballot -- they will go

24   out and have the -- have -- they -- it will be clear, just

25   turning the ballot, as to -- just turn the front of it -- the

```
 1   Class 2 Creditor will get the Class 2 Ballot, the Class 3
 2   Creditor will get the Class 3, and everybody else will get the
 3   Class 4 Ballot.  So that change is going to be made throughout.
 4   So there will be tailor -- it will be tailored by class, but
 5   not by individual, Your Honor.
 6            THE COURT:  Okay.  Because, at Page 4, Paragraph 5(c)
 7   --
 8            MR. KOEVARY:  Page 4 of?
 9            THE COURT:  Of the disclosure statement order.  And
10   this is, I guess, sort of what I was saying before.  I don't
11   understand how Rule 3018 works in the context where no proofs
12   of claim have been filed, and there's no objection.  It says:
13            "As further provided below, any party who wishes to
14            have his claim allowed for purposes of voting on the
15            plan in a manner or amount that is inconsistent with
16            the ballot it receives or the rules shall file a 3018
17            motion."
18            So what does that mean?
19            MR. KOEVARY:  I think -- well, I think, in this case,
20   Your Honor, the -- I mean, that's sort of *pro forma* language.
21   I think, because of its -- and perhaps we could take it out,
22   but I don't think we need to because it's -- quite simply, the
23   ballot is not going to have anything; it's going to be a blank
24   ballot.  So there is simply not going to be anything --
25            THE COURT:  Well, then it doesn't make sense.
```

1          MR. KOEVARY:  Well, I think -- perhaps, Your Honor --

2    I don't know if it would make a change to (c), to be

3    inconsistent with the matter -- if the debtor's claims are

4    inconsistent with how scheduled, or we have a process that just

5    reserves a 3018 right.

6          I mean, the problem, Your Honor, is just we want to

7    get -- I think it's important that we get the ballots out.  And

8    if we use -- I'm concerned that, if we sit here and start

9    filling in the blanks on all of the ballots as to what the

10   proposed amount is going to be, that's going to be a time-

11   consuming expense on a relatively tight case.

12         THE COURT:  Uh-huh.

13         MR. KOEVARY:  So I don't know if ...

14   (Participants confer)

15         MR. KOEVARY:  I mean, they're going to write ...

16   (Participants confer)

17         MR. KOEVARY:  So, as Mr. Saccullo is pointing out to

18   me, Your Honor, I mean, everybody is going to get a ballot,

19   there's going to be a blank amount, they're going to have to

20   fill in the dollar amount.  And if we disagree with the amount,

21   you know, we'll file our papers, and we'll show up to the

22   hearing, and we'll object to the amount.

23         I mean, for voting purposes, if we get amounts that

24   are all different, and if -- like we've had before, where we've

25   had deals, where every creditor who voted wound up voting for

1    the plan, I don't think it's a real issue.  This really only

2    becomes an issue, Your Honor, if and when we're -- some

3    creditors -- if and when there's a question of whether we now

4    have vote acceptance or not.

5          And at that point, we'll come in, and if we think --

6    if somebody comes in and fills out a much higher amount --

7    because this won't have any bearing what they put on the ballot

8    as to ultimate distribution.  It doesn't mean we can't object

9    to their claim amount.

10          THE COURT:  Right.

11          MR. KOEVARY:  So I think, if -- people will put in the

12    ballot what the number is.  And the only way we're going to

13    really go through a -- contest the issue is if it will have a

14    material impact on whether we have the votes or not.  And if

15    it's a material impact, we'll be coming up and -- if it's a

16    material impact, if somebody puts a large number and they put a

17    no amount, then we're going to have to be here, dealing with

18    the claim, at the confirmation hearing.

19      (Pause in proceedings)

20          THE COURT:  I'm just looking at your -- the

21    solicitation procedures really don't conform to the unusual

22    situation that we have here.

23          MR. KOEVARY:  Your Honor is referring to the 3018?

24          THE COURT:  Yep.

25      (Pause in proceedings)

1        THE COURT:  I'm trying to figure out what -- the

2   difference is we -- you have a 3018, which I'm just going to

3   say "unless otherwise ordered by the Court."  And then -- and

4   then you have a hierarchy.

5      (Pause in proceedings)

6        THE COURT:  Okay.  In the order, on Page 5, when it

7   says who you're authorized to distribute the solicitation

8   materials to, in Paragraph 6.

9        MR. KOEVARY:  Hold on.  Okay.

10        THE COURT:  As we discussed, you're going to serve

11   everyone on the schedule.  So I took out:

12        "-- as holding liquidating, non-contingent, and

13        disputed claims in an amount greater than zero."

14        MR. KOEVARY:  Every --

15        THE COURT:  Because you're just serving everybody.

16        And then Paragraph 11, which is 1125(e) protection,

17   I'm not going to give that to you here.  If you want that, you

18   can look for that in your confirmation order.

19        MR. KOEVARY:  Paragraph 11?

20        THE COURT:  Yeah.

21        MR. KOEVARY:  Okay.

22        THE COURT:  That this is procedural.

23        And then Paragraph 18, I've changed your word "shall"

24   to "may."  So objections to confirmation --

25        MR. KOEVARY:  I'm sorry, Your Honor.  Paragraph?

1         THE COURT:  Paragraph 18 of the order.

2         MR. KOEVARY:  I don't think I have an 18.  I don't

3    think I --

4         (Participants confer)

5         THE COURT:  Okay.  It just deals with objection to

6    confirmation --

7         MR. KOEVARY:  Okay.

8         THE COURT:  -- filed and served -- not timely filed

9    and served in the manner may be considered --

10         MR. KOEVARY:  Okay.

11         THE COURT:  -- and may be overruled, but not "shall."

12    We'll deal with that if and when it happens.

13         And then, in your solicitation procedures, temporary

14    allowance, I've just caveated the whole thing, "unless

15    otherwise ordered by the Court."

16         MR. KOEVARY:  Okay.

17         THE COURT:  Okay.  And it's signed.  It will be

18    uploaded, so you'll be able to get it right away.

19         MR. KOEVARY:  Thank you.

20         THE COURT:  Uh-huh.

21         MR. FOX:  I know that, when a judge enters your order,

22    you should always be quiet, but there was just two points that

23    weren't clear:

24         One, whether the committee wants to file a support

25    letter.  I'd have to put it into -- they need to let us know,

```
1    so that I have it before Your Honor signs it because, if Your

2    Honor signs this order --

3              THE COURT:  Does this approve a committee letter?

4              MR. FOX:  No.

5              THE COURT:  I don't think it did.

6              MR. FOX:  No.  But I -- I've asked repeatedly whether

7    they wanted to.  I did say in the plan and disclosure

8    statement, the committee does support it.  But it's sometimes

9    standard and practical to have --

10             THE COURT:  It's up to --

11             MR. FOX:  -- a stand-alone --

12             THE COURT:  -- the committee.

13             MR. FOX:  -- letter.

14             THE COURT:  It's up to the committee whether they're

15   going to do it.  If you want to do it, and you want me to look

16   at it --

17             MR. FOX:  Right.

18             THE COURT:  -- then you need to get it over here.  If

19   you want to do it and you don't want me to look at it --

20             MR. FOX:  Right.  I just don't want to distribute

21   something that's not authorized.  And you know, I will get you

22   the exhibit for the valuation --

23             THE COURT:  Uh-huh.

24             MR. FOX:  -- with the deletions by, you know, first

25   thing tomorrow morning.
```

1              THE COURT:  That's fine.

2              MR. FOX:  Okay.

3              THE COURT:  So that's up to the --

4              MR. FOX:  So just let us know.

5              THE COURT:  That's up to the committee.

6              MR. SACCULLO:  Yeah, we'll talk with the committee.

7              MR. FOX:  Okay.  Thank you, Your Honor.

8              THE COURT:  Anything else?

9              MR. FOX:  No.

10             THE COURT:  Okay.  We're adjourned.

11             MR. FOX:  Thank you.

12         (Proceedings concluded at 11:56 a.m.)

13                            *****

1                        <u>CERTIFICATION</u>

2            I certify that the foregoing is a correct transcript

3     from the electronic sound recording of the proceedings in the

4     above-entitled matter to the best of my knowledge and ability.

5

6

7

8     /s/ Coleen Rand                      October 17, 2016

9     Coleen Rand

10    Certified Court Transcriptionist

11    For Reliable